# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANTHONY BLACKMON,

    Plaintiff,

      v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

    Defendant.

Civil Action No. 04-1347 (CKK)

## MEMORANDUM OPINION
(June 30, 2010)

    Plaintiff Anthony Blackmon brings this action seeking review of the final administrative

decision by Defendant Michael J. Astrue, in his official capacity as Commissioner of Social

Security,[1] denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental

Security Income Benefits ("SSIB") pursuant to 42 U.S.C. § 405(g). Pending before the Court are

Plaintiff's Motion for Judgment of Reversal and Defendant's Motion for Judgment of

Affirmance. After reviewing the parties' briefs, the administrative record, and the relevant case

law, the Court shall DENY Plaintiff's [8] Motion for Judgment of Reversal and GRANT

Defendant's [11] Motion for Judgment of Affirmance, for the reasons that follow.

## I. BACKGROUND

### A. *Legal Framework and Procedural History*

    Plaintiff filed applications for DIB and SSIB pursuant to Titles II and XVI of the Social

---

[1] Plaintiff's Complaint named as Defendant the then-Commissioner of Social Security, Jo Anne B. Barnhart. As Ms. Barnhart was sued in her official capacity, the Court has substituted the current Commissioner of Social Security, Michael J. Astrue, as Defendant pursuant to Federal Rule of Civil Procedure 25(d).

Security Act (the "Act") on May 1, 2001. *See* Pl. Mot. for J. of Reversal ("Pl.'s Mot."), at 1-2.

To qualify for disability insurance benefits and supplemental security income ("SSI"), a claimant

must demonstrate a disability, which is defined by the Act as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months." *See* 42 U.S.C. § 416(i)(1); *id.* § 1382c(a)(3)(A).

In addition, a claimant seeking disability or SSI benefits must have a severe impairment that

makes him unable to perform past relevant work or any other substantial gainful work that exists

in the national economy. *See id.* § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). Substantial gainful

work activity is work activity that involves doing significant physical or mental activities and is

the kind of work that is usually done for pay or profit. *See* 20 C.F.R. § 404.1472.

      In making a disability determination, an Administrative Law Judge ("ALJ") is required to

use a five-step sequential analysis examining (1) the claimant's recent work activity, (2) the

severity and duration of the claimant's impairments, (3) whether the claimant's impairments are

medically equivalent to those contained in the Listing of Impairments promulgated by the Social

Security Administration ("SSA" or the "Administration"), (4) the claimant's residual functional

capacity ("RFC") and ability to perform past work, and (5) the claimant's ability to perform jobs

reasonably available in the national economy. *Id.* §§ 404.1520(a)(4), 416.920(a)(4); *see also*

*Brown v. Barnhart*, 408 F. Supp. 2d 28, 32 (D.D.C. 2006). At the first step in the analysis, the

ALJ must determine whether the claimant is working and whether the work is substantial gainful

activity; if so, the claim must be denied. *See Brown*, 408 F. Supp. 2d at 32. At step two, the ALJ

must determine whether the claimant's impairments are severe; if they are not, the claim must be

denied. *Id.* In step three, the ALJ compares the impairments to a listing of impairments that automatically qualify as a disability under the regulations. If the claimant's impairments match those listed, disability is conclusively presumed. *Id.* If there is no match, the ALJ proceeds to step four and determines whether the claimant has any residual functional capacity to perform his old job. If so, the claim will be denied. *Id.* If not, the ALJ proceeds to step five and determines whether there is any other gainful work in the national economy that the claimant could perform notwithstanding his disability. Although the claimant bears the burden of proof with respect to the first four steps of the analysis, at step five the burden shifts to the Administration to demonstrate that the claimant is able to perform "other work" based on his residual functional capacity, age, education, and past work experience. *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004). If so, the claim must be denied.

Plaintiff is a 48 year-old male resident of Washington, D.C. *See* Administrative Record ("A.R.") at 510. He has a high school education in addition to one and a half years of college. *Id.* at 64, 518. His past relevant work includes work as a data entry clerk, accounts payable clerk, and deputy court clerk. *Id.* at 511. In June of 2002, he returned to work on a part-time basis as a patient escort. *Id.* at 14, 59, 512. In his application for DIB and SSIB, Plaintiff alleged that he was disabled as of April 27, 2001,[2] on the basis of, *inter alia*, human immunodeficiency virus ("HIV"), neuropathy, depression, and fatigue. *See* Pl. Mot. 1-2; A.R. at 13, 52, 482.

Plaintiff's claims were denied both initially and upon reconsideration. A.R. at 13. Plaintiff then requested a hearing before an ALJ. *Id.* at 37-38. That hearing was held on January

---

[2] Plaintiff's application alleged that his disability commenced on April 27, 2001. At his administrative hearing, however, Plaintiff amended his alleged onset date to January 28, 2002. A.R. at 13.

23, 2003. *Id.* at 13. Plaintiff was represented at the hearing by counsel, and a vocational expert ("VE") testified at the ALJ's request. *See id.* at 13. In a decision dated May 1, 2003, the ALJ determined that Plaintiff was not disabled within the meaning of the Act and denied the requested benefits. *See generally id.* at 13-23.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. *Id.* at 15, 21. At step two, the ALJ found that the medical evidence indicated that Plaintiff was HIV positive and that the impairment was "severe." *Id.* at 15, 21. At step three, the ALJ found that Plaintiff's HIV infection did not "meet or medically equal one of the impairments listed" in Appendix 1, Subpart P, No. 4 (20 C.F.R. § 404.1520(d)) and that "no treating or examining physician [had] offered an opinion or reported findings of a listing level severity, none is medically documented and none is supported." *Id.* at 15, 21. The ALJ therefore proceeded to step four, at which point he assessed the Plaintiff's RFC and determined that Plaintiff had the ability to return to his past relevant work as a data entry clerk. *Id.* at 18. The ALJ nonetheless proceeded to step five and determined in the alternative that Plaintiff was capable of performing one of several "light/sedentary" jobs available in significant numbers in the national economy, including cashier, office helper, sales, administrative support person (such as an addresser), order clerk, and charge account clerk. *Id.* at 20. The ALJ therefore determined that Plaintiff "is not disabled . . . and is not entitled to receive Disability Insurance Benefits and is likewise ineligible for Supplemental Security Income payments." *Id.*

Plaintiff sought review of this decision by the Appeals Council. *See id.* at 4-7. On May 19, 2004, the Appeals Council upheld the decision of the ALJ, finding no basis for granting the request for review. *Id.* at 4. Having fully exhausted his administrative remedies, Plaintiff timely

filed suit in this Court.

      *B.     Evidence Contained in the Administrative Record*

The ALJ evaluated Plaintiff's condition based on evidence including various medical records (both physical and mental health records) and the testimony of the Plaintiff and the VE during the administrative hearing in this case. The Court recounts below the most relevant portions of the administrative record.

      <u>1.     Physical Health Records</u>

Plaintiff was a patient at the Whitman Walker Clinic in Washington, D.C., between August 22, 2000, and February 25, 2002. A.R. at 104. The Clinic's medical records show that Plaintiff was diagnosed with HIV in 1991. *Id.* at 105. In addition, the records indicate that Plaintiff has a history of AIDS, peripheral neuropathy, substance abuse, and depression. *Id.* at 105. He was noted to have a baseline weight of 137-145 pounds. *Id.* With respect to the peripheral neuropathy, the Clinic noted that Plaintiff complained of tingling and numbness in his feet and stiffness in his right knee, and that this limited his activity and daily living. *Id.* at 106. Plaintiff was on medication for both his HIV and peripheral neuropathy, *id.*, and the Clinic records indicate that Plaintiff would need to take life long anti-retroviral therapy, *id.* at 156. Plaintiff's HIV was noted to be stable and the records indicate that he had an excellent response to medications. *Id.* at 108, 110, 111, 124, 131.

On July 30, 2001, a Disability Determination Services physician completed a residual functional capacity assessment (physical) for Plaintiff. *Id.* at 194-201. The records show that Plaintiff was HIV positive and suffering from depression. *Id.* at 194. With regards to specific external limitations, it was determined that Plaintiff could occasionally lift or carry 50 pounds,

frequently lift or carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit

for about 6 hours in an 8-hour workday, and engage in an unlimited amount of pushing and

pulling.  *Id.* at 195.  The examining physician also found no established postural, manipulative,

visual, communicative, or environmental limitations.  *Id.* at 196-98.  It was noted that Plaintiff

continued to take his HIV medication, *id.* at 195, but had reported HIV wasting, *id.* at 196.  At

the time of the assessment, Plaintiff was 5'11" and weighed between 140 to 141 ½ pounds.  *Id.*

He reported being able to perform activities of daily living independently, such as dusting,

laundry, food shopping, and attending church.  *Id.* at 199.

Dr. Chitra R. Chari, a neurologist, examined Plaintiff on April 2, 2002.  *Id.* at 220-22.

Dr. Chari noted that Plaintiff had "weakness in his left arm" and could not "hold heavy objects . .

. more than 10 lbs too long."  *Id.* at 220.  In addition, he complained of previously having had

pain in his knees and a numbness in his feet to knees, but indicated that he felt better since he had

begun medication.  *Id.*  Dr. Chari further noted that Plaintiff's "[m]uscle strength was 5/5 in all

four limbs," although he had a "decrease in touch and pin sensation from the feet to about two-

thirds into the legs and from hands to about one-third into the forearm."  *Id.* at 222.  Dr. Chari

concluded that Plaintiff had "signs and symptoms consistent with peripheral neuropathy."  *Id.*  In

addition, the records indicate that Plaintiff reported a history of depression, but stated that he had

no recent problems with depression and was not on medication for his depression at that time.

*Id.* at 221.

Plaintiff underwent a second physical residual functional capacity assessment on April

18, 2002, performed by Dr. Isabelle Pico.  *Id.* at 223-30.  The records again show that Plaintiff

was HIV positive and was suffering from depression.  *Id.* at 222.  Dr. Pico found that Plaintiff

was able to lift 50 pounds occasionally and 25 pounds frequently and could stand, walk, and sit

for about 6 hours in a normal workday. *Id.* at 224. Dr. Pico further determined that Plaintiff had

unlimited ability to push and pull, and that he exhibited muscle strength of 5/5 in all extremities.

*Id.* at 224. Plaintiff was again found to have a decrease in touch and pin sensation from the feet

to two-thirds of the way up the leg, and from the hands to one-third of the forearm, but

nonetheless was found to have no postural, manipulative, visual, communicative, or

environmental limitations. *Id.* at 224-27.

### 2. Mental Health Records

Plaintiff's medical records indicate that on June 26, 2001, he was brought to the

emergency room for a prescription medication overdose. *Id.* at 159. He was subsequently

admitted to Prince George's Hospital Center, which records show a principal diagnosis of "major

depressive disorder, single episode, severe, with psychotic features, with suicide attempt." *Id.* at

168. Plaintiff was started on medication to treat his depression and his HIV. *Id.* at 175.

On February 25, 2002, Dr. Neil Schiff performed a general psychological evaluation of

Plaintiff. *Id.* at 217-19. Dr. Schiff determined that Plaintiff had a Verbal IQ of 77, a

Performance IQ of 79, and a Full Scale IQ of 76. *Id.* at 217. Based upon administration of the

Wechsler Adult Intelligence Scale-III, Dr. Schiff concluded that Plaintiff "is currently

functioning in the borderline range of intelligence." *Id.* at 218. Dr. Schiff further observed,

however, that Plaintiff "was alert and oriented to person, place, and time" and that "[h]is speech

was coherent and relevant, and no gross memory deficit was apparent during the interview." *Id.*

at 218. In addition, the evaluation indicates that Plaintiff "showed no signs of psychotic

symptoms or thought disorder," and, while "[h]is mood appeared mildly depressed, [] he was

generally pleasant and cooperative." *Id.* Plaintiff was also noted to have had "no difficulty understanding and following simple instructions," and had "moderately good, if somewhat erratic, success with more complex or detailed tasks and instructions." *Id.* Dr. Schiff further determined that Plaintiff's "vocabulary, his abstract conceptualization, his common-sense reasoning and judgment, his discrimination of relevant visual detail, and his nonverbal, logical reasoning were in the mildly deficient range for his age, and his mental manipulation of numbers was moderately deficient." *Id.* at 219. The evaluation concluded that, at present, Plaintiff was "capable of learning and performing relatively simple routines, although his capacities for concentration are limited." *Id.* Dr. Schiff diagnosed Plaintiff with depressive disorder and borderline intellectual functioning. *Id.*

On April 18, 2002, Plaintiff underwent a mental residual functional capacity assessment performed by Dr. Patricia Cott, a Disability Determination Service physician. *Id.* at 232-35. Dr. Cott also completed a psychiatric review technique. *Id.* at 236-49. Plaintiff was reported to have only moderate to no significant limitations in his mental RFC. *Id.* at 232-33. Specifically, Plaintiff was noted to have moderate limitations in his ability to understand, remember, and carry-out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism; complete a normal workday and workweek without interruption; interact appropriately with the general public; and set realistic goals or make plans independently of others. *Id.* at 232-33. Plaintiff otherwise was found to have no significant limitations in his mental RFC. *Id.* Dr. Cott concluded that Plaintiff was capable of learning and performing simple tasks and routine work. *Id.* at 234.

With respect to the psychiatric review technique, Dr. Cott indicated that she had based

her determinations on further RFC assessment. *Id.* at 236. The records show that Dr. Cott found the presence of a psychological or behavioral abnormality associated with a dysfunction of the brain, but noted that the impairment did not precisely satisfy any of the listed diagnostic criteria; she did, however, rule out neurological cognitive impairment related to HIV. *Id.* at 237. Similarly, Dr. Cott concluded that Plaintiff had evidence of a mood disturbance, accompanied by a full or partial manic or depressive syndrome, but again noted that the impairment did not precisely satisfy any of the listed diagnostic criteria. *Id.* at 239. Dr. Cott concluded that Plaintiff's behavioral and physical changes were associated with his past history of substance abuse. *Id.* at 244. The records also show that Plaintiff had moderate difficulty with the activities of daily living, social functioning, and maintaining concentration, persistence, or pace, but had only one or two episode of decompensation that lasted for an extended duration. *Id.* at 246. He was found to be "capable of learning and performing simple routines," and to have signs and symptoms of peripheral neuropathy. *Id.* at 248.

### 3. Transcript of the Administrative Hearing

After initially being denied benefits, Plaintiff requested a hearing before an Administrative Law Judge. *Id.* at 502. The hearing was held on January 23, 2003, before ALJ Guy B. Arthur. *Id.* at 507-30. Plaintiff was represented by counsel at the hearing, and a VE was present as well. *Id.* at 509. Plaintiff testified that he had worked as an accounts payable clerk, data entry clerk, and deputy court clerk. *Id.* at 511. According to Plaintiff, his past jobs required him to "[w]alk around a lot;" he also indicated that he would occasionally lift between 10 and 20 pounds while working at accounts payable and as a data entry clerk and often lifted as much as 50 to 60 pounds while working as a deputy court clerk. *Id.* at 511-12. At the time of the hearing,

Plaintiff stated that he worked part time as a patient escort at a treatment facility; he stated that he had been working at the facility since approximately March of 2002. *Id.* at 512-14. In addition, Plaintiff testified that he was voluntarily enrolled in a drug treatment facility and had not taken drugs for approximately one year. *Id.* at 514-16.

With respect to his physical and mental health, Plaintiff testified that he had recently switched medications for his HIV treatment, as he had become immune to the previous medication, but confirmed that he was compliant with this new medication. *Id.* at 517, 520. He also testified that he experienced several side effects as a result of his medication, including hand cramps and diarrhea. *Id.* at 521. In addition, Plaintiff indicated that he was experiencing neuropathy in his knees, legs, feet, and hands, and that he was experiencing loss of memory and loss of weight. *Id.* at 519.

The ALJ also took testimony from the VE, who stated that he was familiar with Plaintiff's medical records and had been present during Plaintiff's testimony. *Id.* at 524. The VE described Plaintiff's prior work as an accounts payable clerk as "light duty, semiskilled," and indicated that his data entry job was "sedentary, semiskilled." *Id.* He also testified that Plaintiff's work as a deputy court clerk was a "medium duty, semiskilled position," and that his current work as a patient escort was "light duty, semiskilled." *Id.* at 524-25. During the hearing, the ALJ asked the VE if he could identify any jobs in the national economy that a hypothetical person who had the same age, education, and work experience as the Plaintiff could perform. *Id.* at 526-28. Specifically, the VE was asked to consider a series of six escalating hypotheticals regarding the availability of work for persons with an increasing degree of impairments similar to those claimed by the Plaintiff. *Id.*

In the <u>first</u> base hypothetical, the VE was asked to consider someone who: had the capacity for "low-stress, routine type of work . . . that doesn't require more than moderate attention, concentration, [] persistence and pace for long periods of time." *Id.* at 527. The individual in this hypothetical could not "climb ladders, ropes, and scaffolds" and was precluded from work involving exposure to "hazardous heights, [] hazardous moving machinery, [] extreme temperature changes." *Id.* In addition, the individual could not be exposed in concentrated levels to "dust, fumes, chemicals, poor ventilation[,] excessive humidity or excessive wetness." *Id.* The VE was to assume, however, that the individual could "frequently climb stairs and ramps, [] frequently balance and stoop, [and] occasionally kneel and crouch;" had "slight to [] moderate pain;" and had "no more than moderate limitations as far as the ability to perform activities within a schedule, maintain regular attendance[,] be punctual with a customary tolerance, . . . [and] complet[e] a normal workday or workweek . . . without an unreasonable length and number of rest periods." *Id.* In response to this first hypothetical, the VE testified that significant employment opportunities existed in both "light duty, unskilled work" and in "sedentary unskilled work." *Id.* at 528-29. The VE identified specific positions available in each category, including cashier II, office helper, and sales attendant with respect to the "light duty, unskilled work" category and administrative support worker, an order clerk, and a charge account clerk with respect to the latter "sedentary unskilled work" category. *Id.* at 529. The VE testified that "[a]ll jobs mentioned are consistent with the descriptions provided in The Dictionary of Occupational Titles." *Id.* at 529.

In the <u>second</u> hypothetical, the ALJ added two restrictions to the base hypothetical delineated above. Specifically, the ALJ asked the VE to consider an individual who had all the

limitations set forth in the first hypothetical but who also (1) has "borderline intellectual functioning;" and (2) cannot perform "work that requires kneeling, crouching and crawling," and could only "occasional[ly] [] climb[] stairs, ramps and balanc[e] and stoop[]." *Id.* at 527. In response, the VE testified that "[t]here would be no change" to the number and types of jobs available under hypothetical two, such that his answer was the same for both the first and second hypotheticals. *Id.* at 529.

In the third hypothetical, the ALJ instructed the VE to "make it more restrictive" by considering, in addition to the above limitations, the limitation that the individual could not engage in any work that required "above the shoulder upper extremity lifting or carrying [or] lower extremity use of push/pull controls." *Id.* at 527-28. The VE responded that, in light of these additional limitations, the number of light duty positions available would be "reduce[d] . . . by approximately 10 percent." *Id.* at 529.

In the fourth hypothetical, the ALJ added the additional limitation that the individual could not engage in work that required "repetitive bilateral hand use," although he noted that he was "not precluding all use of the right or left hand." *Id.* at 528. The VE indicated that under this fourth hypothetical, with the added limitation of no repetitive bilateral hand use, the number of light duty positions would be reduced an additional 20 percent and the number of sedentary positions available would be reduced by 10 percent. *Id.* at 529.

In the fifth hypothetical, the ALJ indicated that the VE should further limit the work the individual could perform by excluding "prolonged walking and standing" and requiring a "sit/stand option with no more than half an hour sitting or standing at any one time." *Id.* at 528. The VE responded that these additional limitations would eliminate any available work in the

light duty category and would leave only the work identified above in the sedentary category.  *Id.* at 529.

Finally, in the <u>sixth</u> hypothetical, the ALJ asked the VE to elevate the pain level and "non-exertionals, such as the ability for persistence and pace" to "above moderate to severe [on] a chronic basis."  *Id.* at 528.  The VE testified that "there would be no work available to [] a hypothetical individual" with this final added limitation.  *Id.* at 529.

## II.  LEGAL STANDARD

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability.'"  *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)).  The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Inability to engage in substantial gainful activity not only includes the individual's inability to do his previous work, but requires as well an inability, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  *Id.* at § 423(d)(2)(A).  In making this determination, the ALJ is to consider (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) the plaintiff's age, education, and work history; however, "[t]he expert opinions of a

treating physician are binding on the fact finder unless contradicted by substantial evidence to the contrary." *Davis v. Heckler*, 566 F. Supp. 1193, 1196 (D.D.C. 1983) (citing cases).

A court will not disturb the determination of the Commissioner if it is based on substantial evidence in the record and the correct application of the relevant legal standards. 42 U.S.C. §§ 405(g), 1383(c); *Butler*, 353 F.3d at 999. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). "The test 'requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.'" *Butler*, 353 F.3d at 999 (quoting *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003)).

In reviewing an administrative decision, a court may not determine the weight of the evidence nor substitute its judgment for that of the Commissioner if his decision is based on substantial evidence. *Butler*, 353 F.3d at 999; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Instead, the reviewing court must carefully scrutinize the entire record to determine whether the Commissioner, acting through the ALJ, has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative material. "Because the broad purposes of the Social Security Act require a liberal construction in favor of disability, the court must view the evidence in the light most favorable to the claimant." *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000) (citing *Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994)). The reviewing court must also determine whether credible evidence was properly considered. *Id.* (citing *Dionne v. Heckler*, 585 F. Supp. 1055 (D. Me. 1984)). Importantly, an ALJ cannot merely disregard evidence which does not support his conclusion. *Dionne*, 585 F. Supp. at 1060. A reviewing court should not be left guessing as to how the ALJ evaluated probative material, and

it is reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence. *Martin*, 118 F. Supp. 2d at 13 (citing *Davis*, 862 F. Supp. at 2).

## III.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed, or alternatively that this case should be remanded to the Administration for a new hearing.  He makes six arguments in support of these requests: (1) the ALJ erroneously determined that Plaintiff was performing substantial gainful activity; (2) the ALJ improperly determined that Plaintiff's depression, borderline intellectual functioning, and peripheral neuropathy were non-severe impairments; (3) the ALJ failed to follow the proper procedure for analyzing mental impairments; (4) the ALJ erroneously assessed Plaintiff's RFC; (5) the ALJ erroneously determined that Plaintiff was capable of performing his past-relevant work; and (6) the ALJ erroneously relied upon the testimony of the VE.  *See* Pl.'s Mot.  Defendant disputes Plaintiff's characterization of the ALJ's opinion, asserting that the ALJ's decision was supported by substantial evidence.  *See generally* Def.'s Mot. for J. of Affirmance ("Def.'s Mot.").  The Court shall address these arguments below.

### A.      *Substantial Gainful Activity*

As indicated above, the ALJ found at step one of the evaluation that Plaintiff had "not engaged in substantial gainful activity since his alleged onset date" and therefore proceeded to consider the remaining steps in the sequential analysis.  A.R. at 15; *see also id.* at 21.  Despite this explicit finding, Plaintiff argues that the ALJ in fact held to the contrary that Plaintiff had engaged in substantial gainful activity.  Pl.'s Mot. at 4-6.  As support for this argument, Plaintiff directs the Court to the ALJ's observation, made in passing, that the "[t]he work performed [by

Plaintiff] . . . appear[s] to be of a substantial gainful work nature." A.R. at 15. Plaintiff's

reliance on this statement, however, is misplaced. Although the ALJ briefly suggested that the

work performed by Plaintiff appeared to be of a substantial gainful nature, the ALJ nonetheless

expressly found for purposes of his decision that the "claimant has not engaged in substantial

gainful activity since his alleged onset date." A.R. at 15, 21. Indeed, on that basis, the ALJ

proceeded to consider the remaining steps in the evaluation process, which would have been

unnecessary had he in fact found, as Plaintiff urges, that Plaintiff had performed substantial

gainful work. *See id.* at 15-21. Accordingly, the Court finds Plaintiff's assertion that the ALJ

erred at step one to be without merit.

B.      *The Severity Analysis*

At step two of the sequential process, the ALJ must "consider the medical severity of [the

claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant

has a severe impairment, the ALJ must proceed to step three; if, however, the claimant does not

have a severe impairment, the claimant is found to be not disabled. *See id.* In this case, the ALJ

determined only that Plaintiff's HIV status was a severe impairment and made no similar finding

that Plaintiff's remaining impairments — namely, his depression, borderline intellectual

functioning, and peripheral neuropathy — were severe impairments at step two of the sequential

analysis. A.R. at 15, 21. Plaintiff argues that this finding is legal error for two reasons. *See* Pl.'s

Mot. at 6-10. First, Plaintiff argues that there is substantial evidence in the record indicating that,

contrary to the ALJ's finding, his depression, borderline intellect, and neuropathy were severe

impairments. *Id.* at 6-9. Second, Plaintiff contends that the ALJ failed to properly explain his

reasoning for finding that these impairments were not severe. *Id.* at 9-10. Accordingly, Plaintiff

urges that the ALJ committed a legal error when he failed to find Plaintiff's non-HIV impairments to be severe at step two.

The Court finds that any alleged error at step two does not require reversal in this case. While it appears that the D.C. Circuit has not yet addressed the question at hand, the Sixth, Ninth, and Tenth Circuits have each held that alleged errors at step two do not necessarily require reversal so long as the ALJ considered the omitted impairment(s) in evaluating the remaining steps in the sequential analysis. For example, in *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005), the Ninth Circuit rejected the plaintiff's argument that the failure to consider her obesity at step two required reversal of the Commissioner's decision denying her benefits. *Id.* at 681-82. The Ninth Circuit observed that, "[a]ssuming without deciding that this omission constituted legal error, it could only have prejudiced [plaintiff] in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor." *Id.* Because the plaintiff did not identify any legal errors at either of those steps, the Ninth Circuit concluded that "[u]nder the circumstances . . ., the ALJ did not commit reversible error by not considering [plaintiff's] obesity in step two of the sequential analysis." *Id.* at 682. In other words, so long as there is no indication that the impairments allegedly omitted at step two would have met a listing at step three and the ALJ properly considered the omitted impairments in evaluating the plaintiff's RFC at step four or step five, any alleged legal error at step two is harmless. *See id.*

The Sixth Circuit reached the same conclusion in *Maziarz v. Secretary of Health and Human Services*, 837 F.2d 240 (6th Cir. 1987), determining that it was "unnecessary to decide" whether the ALJ had committed a legal error when he failed to find the plaintiff's cervical

condition constituted a severe impairment at step two. *Id.* at 244. In reaching this conclusion, the Sixth Circuit emphasized that the ALJ had found that the plaintiff's other conditions were severe and had therefore continued with the remaining steps in the sequential analysis. *Id.* at 244. The *Maziarz* Court concluded, "[s]ince the Commissioner properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Commissioner's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error." *Id.* Similarly, in *Carpenter v. Astrue*, 537 F.3d 1264 (10th Cir. 2008), the Tenth Circuit rejected the plaintiff's argument that the decision below should be reversed because the ALJ applied the wrong legal standard at step two when he failed to consider whether her impairments were severe both individually and in combination. *Id.* at 1265-66. The Tenth Circuit concluded that "any error [at step two] became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step in the evaluation sequence." *Id.* at 1265-66.

The Court is persuaded by the reasoning of these decisions and agrees that, in this case, any legal error made at step two does not require reversal. Even assuming that the ALJ legally erred when he determined that Plaintiff's borderline intellectual functioning, depression, and peripheral neuropathy were non-severe, such an omission did not prejudice Plaintiff because the ALJ specifically found that Plaintiff's HIV infection was a seizure impairment, AR at 15, 21, and therefore continued to consider the remaining steps in the sequential analysis, *see id.* at 15-21.

While Plaintiff may have been able to nonetheless demonstrate prejudice if he had shown that the omitted impairments would have been found to meet a listing at step three, there is no

indication in the record that any of Plaintiff's non-HIV impairments satisfied any enumerated listing. Indeed, the ALJ specifically found as much, observing that "no treating or examining physician offered an opinion or reported findings of a listed level severity, none is medically documented and none is supported." *Id.* at 15. Plaintiff appears to agree that none of his impairments, including his non-HIV impairments, met or equaled an enumerated listing as he does not challenge the ALJ's findings at step three and makes no argument in his present briefing that his depression, borderline intellectual functioning, or neuropathy should have been found to meet or equal a listing. *See generally* Pl.'s Mot. As such, even assuming that the ALJ committed a legal error at step two, Plaintiff was not prejudiced by this error at step three of the sequential analysis.

Nor did any such legal error prejudice Plaintiff at step four or step five of the evaluation. As is discussed in detail below, the Court finds that the ALJ properly assessed Plaintiff's RFC and considered all of her impairments — including his depression, borderline intellectual functioning, and neuropathy — at steps four and five of the analysis. *See infra* pp. 28-33. Accordingly, the Court need not determine whether the ALJ's finding of non-severity as to Plaintiff's depression, neuropathy, and borderline intellect was legal error, as any alleged error at step two did not prejudice Plaintiff and therefore does not require reversal.

C.   *Analysis of Mental Impairments*

Pursuant to 20 C.F.R. § 404.1520a, the SSA is required to follow a "special technique" when evaluating any alleged mental impairments. In particular, the regulation requires that the SSA "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s);" "[i]f [the

SSA] determine[s] that [the claimant has] a medically determinable mental impairment(s), [the SSA] must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [its] findings . . . ." 20 C.F.R. § 404.1520a(b). Plaintiff argues that the ALJ failed to follow this procedure in evaluating his alleged mental impairments and that this failure constitutes reversible error. Pl.'s Mot. at 10-13. For the reasons set forth below, the Court does not agree and finds that the ALJ appropriately evaluated Plaintiff's mental impairments.

First and most importantly, Plaintiff's argument on this point is based upon an inaccurate and outdated version of the relevant regulation. In arguing that the ALJ committed legal error, Plaintiff has relied principally on the Ninth Circuit's decision in *Gutierrez v. Apfel*, 199 F.3d 1048 (9th Cir. 2000), in which the Court of Appeals held that "20 C.F.R. § 404.1520a requires [a psychiatric review technique form] to be completed and appended to the [ALJ's] decision, and the failure to do so requires remand to the Social Security Administration." *Id.* at 1051. Plaintiff fails to acknowledge, however, that this holding by the Ninth Circuit has since been superseded by regulation. *See Selassie v. Barnhart*, 203 Fed. App'x 174, 176 (9th Cir. 2006) (recognizing that *Gutierrez* has been superseded by amendments to 20 C.F.R. § 404.1520a). Specifically, the regulation no longer mandates that the ALJ fill out and attach a psychiatric review technique form to the final decision, but rather provides only that the ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique." 20 C.F.R. § 404.1520a(e). That is, the decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)" and also "must include a specific finding as to

the degree of limitation in each of the functional areas described in paragraph (c)[3] of this section."  *Id.*  As the Ninth Circuit has since explained, these post-*Gutierrez* amendments to 20 C.F.R. § 404.1520a "have given the ALJ greater discretion in deciding how best to publish the mandated findings."  *See Selassie*, 203 Fed. App'x at 176.  Plaintiff's reliance on *Gutierrez* is therefore misplaced.

Second, the Court finds that the ALJ sufficiently complied with the requirements of 20 C.F.R. § 404.1520a in its present form by "incorporat[ing] the pertinent findings and conclusions based on the technique."  Review of the decision demonstrates that the ALJ's decision adequately includes discussion of the Plaintiff's "significant history, including examination and laboratory findings," regarding his alleged mental impairments.  20 C.F.R. § 404.1520a(e)(2). The ALJ cited to medical evidence from the Whitman Walker clinic indicating that Plaintiff had a history of depression and from the Prince George's Hospital Center showing that Plaintiff had been admitted for a suicide attempt and had been diagnosed with a depressive disorder single episode, severe without psychotic features.  A.R. at 16.  The ALJ's decision also discusses Dr. Schiff's general psychological evaluation of Plaintiff in February of 2002, in which Dr. Schiff determined that Plaintiff was "functioning in the borderline range of intelligence," but nonetheless demonstrated no apparent "gross memory deficit [] during the interview" and had "no difficulty understanding and following simple instructions."  *Id.* at 16-17.  In addition, the ALJ referenced Dr. Schiff's conclusion that Plaintiff "showed no signs of psychotic symptoms or thought disorder," and that, although "[h]is mood appeared mildly depressed, [] he was generally

---

[3] Paragraph (c) identifies the following "four broad functional areas:" (1) "activities of daily living;" (2) "social functioning;" (3) "concentration, persistence, or pace;" and (4) "episodes of decompensation."  20 C.F.R. § 404.1520a(c)(3).

pleasant and cooperative." *Id.* Finally, the ALJ noted as well that Plaintiff had undergone a mental residual functional capacity assessment, in which it was determined that he did not have a neuro cognitive impairment related to his HIV positive status and was capable of learning and performing simple routine tasks. *Id.* at 17.

In addition, the ALJ's decision "include[s] a specific finding as to the degree of limitation in each of the [four required] functional areas." 20 C.F.R. § 404.1520a(e)(2). Review of the ALJ's decision shows that he included specific citations to Dr. Cott's findings that Plaintiff had only moderate difficulties with the activities of daily living, social functioning, and maintaining concentration, persistence, or pace and had experienced only one or two episode of decompensation that lasted for an extended duration. A.R. at 17. It is evident from the ALJ's decision that he accepted these findings and incorporated them into his RFC of Plaintiff. For example, with respect to Plaintiff's ability to perform the activities of daily living, the ALJ found that Plaintiff was "able to perform activities of daily living independently and care for his own personal needs." *Id.* at 18. As regards Plaintiff's ability to engage in social functioning, the ALJ found that Plaintiff was "able to think, communicate and act in his own interest" and had "moderate [] limitations as to the ability to . . . work in coordination or proximity to others without distracting them or being distracted by them." *Id.* at 18, 20. The ALJ also noted that Plaintiff's ability to perform work was limited by his "borderline intellect[]" and "need for work of a low stress routine [i.e., requiring no more than moderate attention and concentration, persistence and pace for prolonged periods]." *Id.* at 19-20, 21-22. Accordingly, the Court finds that the ALJ properly evaluated Plaintiff's mental impairments in compliance with 20 C.F.R. § 404.1520a.

D.      *The Residual Functional Capacity Analysis*

To make a determination under steps four and five of the disability analysis, which involve an inquiry into the claimant's ability to return to past work and a determination of whether future employment of any variety is possible, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ must engage in a residual functional capacity analysis. *Id.* §§ 404.1545, 416.945; SSR 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184 at *2 (S.S.A. July 2, 1996). An RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical or mental activities." SSR 96-8p, 1996 WL 374184 at *2. The ALJ must explain how he considered and resolved ambiguities in the record with regard to the ultimate RFC decision. *Butler*, 353 F.3d at 1000.

Plaintiff raises three main arguments challenging the ALJ's RFC analysis. First, he argues that the ALJ was required to, but did not, perform a function-by-function assessment of Plaintiff's ability to work or include a narrative discussion of how the evidence supported the ALJ's RFC conclusion. Pl.'s Mot. at 13-16. Second, he argues that the ALJ failed to engage in a detailed assessment of Plaintiff's capacity to perform the mental demands of work. *Id.* at 16-18. Third, Plaintiff contends that because the ALJ failed to address the severity of Plaintiff's non-HIV impairments at step two, the impairments were therefore not addressed in the RFC. *Id.* at 19. The Court finds that these arguments are without merit.

First, the ALJ performed a sufficient function-by-function assessment and provided a sufficient narrative in support thereof. Plaintiff is correct that SSR 96-8p requires the ALJ to

assess a claimant's "work-related abilities on a function-by-function basis" and instructs that "[o]nly after that may RFC be expressed in terms of exertional levels of work . . . ." SSR 96-8p, 1996 WL 374184 at *1.[4]  However, SSR 96-8p also provides that "[w]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.*

In this case, the ALJ performed a sufficient function-by-function assessment of all functions for which the record included evidence of limitations.  The ALJ's conclusion regarding Plaintiff's physical RFC stated as follows:

> After observing and listening to the claimant's testimony, this [ALJ] is convinced that the claimant can engage in substantial gainful activity.  The undersigned finds that claimant's testimony concerning his impairments and their impact on his ability to work are not entirely credible to the extent alleged.  Specifically, the undersigned noted that although the claimant alleges that he has HIV positive, he has been working part time as a patient escort at least 20 hours per week.  Furthermore, the undersigned notes that although the claimant tested positive for HIV, the medical evidence fails to document a listing level impairment or an impairment individually [or] in combination that would preclude the claimant from engaging in work for any 12-month continuous period.  Even though the claimant has some weakness and numbness in his arms and legs, the medical evidence does not support any serious muscle weakness or loss of control due to nerve damage.

A.R. at 18.  With respect to Plaintiff's mental RFC, the ALJ further concluded that:

> The claimant alleged having depression and having some memory problems.

_____

[4] SSR 96-8p specifically instructs the ALJ to consider the functions in paragraphs (b), (c), and (d) of 20 C.F.R. § 416.945, which include physical abilities (sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions including manipulative or postural functions), mental abilities (understanding, remembering, carrying out instructions, responding appropriately to supervision, coworkers, and work pressures in a work setting), and other abilities affected by impairments (including specifically, impairments of vision).  20 C.F.R. § 416.945.

Specifically, the medical evidence shows that the claimant is able to think, communicate, and act in his own interest. He is able to perform activities of daily living independently and care for his own personal needs. Furthermore, the claimant can follow basic instructions. The claimant demonstrated a good ability at the hearing to understand, remember and respond to the questions posed by both the undersigned [ALJ] and his legal representative [albeit not always credible].

*Id.*

Based on these observations, the ALJ concluded that Plaintiff "retains the residual functional capacity to perform light work and alternatively sedentary work activity within the limits of the specific residual functional capacity determined." *Id.* Specifically, the ALJ determined that Plaintiff's ability to perform light and sedentary work was limited as follows:

[B]orderline intellectual [functioning] with the need for work of a low stress routine nature [i.e. requiring no more than moderate attention and concentration, persistence and pace for prolonged periods] and having the ability to occasionally climb stairs and ramps and balance and stop, and occasionally kneel and crouch but no crawling; no concentrated exposure to dusts, fumes, chemicals, poor ventilation or excessive humidity or wetness or excessive vibrations; while experiencing moderate[5] pain; with moderate [as defined] limitations as to the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and work in coordination or proximity to others without distracting them or being distracted by them.

*Id.* at 21-22. In reaching these findings, the ALJ explicitly noted that he was "granting the claimant some benefit of doubt with respect to some of the postural limitations in the light of limited medical evidence to specifically support the same." *Id.* at 21.

While Plaintiff claims that the ALJ's "residual functional capacity assessment is nothing

_____

[5] The ALJ defined "moderate" as "a level of severity to preclude the attention and concentration required for high stress production oriented work and complex work but not of a level of severity or magnitude to preclude the attention and concentration required for less stressful work of an unskilled or semi-skilled nature involving simpler work instructions with the term simpler being used as is customarily used in normal work rules and not referring to sheltered work shop type work." A.R. at 22.

more than a naked conclusion, devoid of analysis," Pl.'s Mot. at 15, even a cursory glance at the passages above makes clear that the ALJ carefully considered and evaluated the medical evidence in the record and included an adequate narrative explaining how the evidence supported his conclusions. Moreover, consideration of the ALJ's decision, and the passages cited above in particular, the Court finds that the ALJ adequately identified inconsistencies in the record and explained how he arrived at his conclusions. The ALJ carefully explained why he discredited Plaintiff's own contradictory statements about his impairments. In addition, the ALJ noted that where the record evidence was limited, he gave Plaintiff the benefit of the doubt and resolved any inconsistences in Plaintiff's favor.

Second, Plaintiff argues that the ALJ failed to engage in the "more detailed" assessment of the Plaintiff's mental limitations as required by SSR 96-8p. Pl.'s Mot. at 18; *see* SSR 96-8p, 1996 WL 374184 at *2. As discussed previously, the Court finds that the ALJ engaged in a sufficiently detailed assessment of the relevant evidence in the record regarding Plaintiff's mental impairments. *See supra* pp. 19-22, 24-25. In regard to Plaintiff's activities of daily living, the ALJ noted, that Plaintiff was "able to perform activities of daily living independently and care for his own personal needs." A.R. at 18. With respect to Plaintiff's social functioning, the ALJ pointed out that Plaintiff was "able to think, communicate and act in his own interest," had "moderate [] limitations as to the ability to . . . work in coordination or proximity to others without distracting them or being distracted by them," and had "demonstrated a good ability at the hearing to understand, remember and respond to" questions from the ALJ and counsel." *Id.* at 18, 20. The ALJ also took into account Plaintiff's "borderline intellect[]" and "need for work of a low stress routine [i.e., requiring no more than moderate attention and concentration,

persistence and pace for prolonged periods]." *Id.* at 19-22.

In addition, while Plaintiff is correct that the ALJ did not specifically list the work-related functions itemized on Dr. Cott's mental residual functional capacity assessment, Plaintiff does not cite any case supporting the supposition that an ALJ's opinion must include such an itemization. Pl.'s Mot. at 18. Moreover, as review of the ALJ's decision demonstrates, the ALJ explicitly cited to Dr. Cott's general findings in her mental residual functional capacity assessment that Plaintiff shows only "moderate limitations to no significant limitations." A.R. at 17. None of Plaintiff's functions in Dr. Cott's assessment were "markedly limited." *Id.* at 232-33. Furthermore, the ALJ specifically incorporated Dr. Cott's findings that Plaintiff was moderately limited in certain areas relating to understanding and memory, concentration and persistence, social interaction, and adaption. *See id.* at 19-20 (taking in account Plaintiff's moderate limitations in "attention and concentration;" "persistence and pace;" "ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;" and ability to "work in coordination or proximity to others without distracting them or being distracted by them").

Third, Plaintiff contends that because the ALJ failed to address the severity of Plaintiff's non-HIV impairments at step two, the impairments were therefore not addressed in the RFC. Pl.'s Mot. at 19. This argument is equally without merit. Even assuming that the ALJ erroneously failed to find the Plaintiff's peripheral neuropathy, depression, and borderline intellectual functioning were severe at step two of the sequential analysis, this failure does not automatically mean that the ALJ's RFC analysis was also inadequate. An RFC is based on a consideration of "all . . . medically determinable impairments of which . . . [the ALJ is] aware,

***including . . . medically determinable impairments that are not "severe."*** 20 C.F.R. §

404.1545(a)(2) (emphasis added).   Accordingly, an ALJ should consider even those impairments

found to be non-severe in evaluating a claimant's RFC.   In this case, review of the final decision

demonstrates that the ALJ did just that.   As noted above, the ALJ took into consideration

Plaintiff's non-HIV impairments — to the extent he found them credible — in evaluating

Plaintiff's RFC.   The Court therefore finds that the ALJ did not legally err in analyzing Plaintiff's

RFC.

>E.   *Plaintiff's Ability to Perform Past-Relevant Work and/or Jobs Reasonably
>      Available in the National Economy*

The ALJ determined at step four that Plaintiff had the ability to return to his past relevant

work as a data entry clerk.  A.R. at 18.   The ALJ also ruled in the alternative at step five that,

based on the VE's testimony, Plaintiff was capable of performing one of several

"light/sedentary" jobs available in significant numbers in the national economy, including

cashier, office helper, sales, administrative support person, order clerk, and charge account clerk.

*Id.* at 20.   Plaintiff argues that these findings were both in error.  *See* Pl.'s Mot. at 19-27.   The

Court does not agree.   Review of the record in this case demonstrates that the ALJ's findings at

step five are supported by substantial evidence in the record.   Although the propriety of the ALJ's

findings at step four is a closer question, the Court need not decide this issue given its conclusion

below that the ALJ's alternative disposition at step five is supported by substantial evidence.  *See*

*Smith v. Astrue*, 534 F. Supp. 2d 121, 130 & n. 10 (D.D.C. 2008) (approving the use of

alternative dispositions) (citing cases).

Turning then to Plaintiff's arguments regarding the ALJ's determination at step five,

Plaintiff argues that this alternative finding was in error for two reasons. First, Plaintiff contends that the ALJ's failure to consider Plaintiff's non-HIV impairments at step two "carried forward through the sequential process to the hypothetical question to the VE." Pl.'s Mot. at 23. This argument can easily be disposed of for the same reasons the Court has already discussed above. *See supra* pp. 27-28. Specifically, even assuming that the ALJ erred in finding that Plaintiff's non-HIV impairments were non-severe at step two of the sequential analysis, this failure does not mean that the ALJ's RFC analysis was also inadequate; to the contrary, as discussed above, the ALJ appropriately considered Plaintiff's peripheral neuropathy, depression, and borderline intellectual functioning in assessing Plaintiff's RFC. Plaintiff's argument on this point is therefore without merit.

Second, Plaintiff argues that the VE's testimony conflicts with the occupational information contained in *The Dictionary of Occupational Titles* ("DOT"), and that the ALJ therefore erred when he relied on the VE's testimony. Pl.'s Mot. at 23-27. As indicated above, the VE testified in response to the ALJ's hypothetical questions that significant employment opportunities existed in both "light duty, unskilled work" and in "sedentary unskilled work," and identified the following positions available in each category: (1) with respect to the "light duty, unskilled work" category, the VE indicated the individual could work as a cashier, office helper, and sales attendant; and (2) with respect to the latter "sedentary unskilled work" category, the VE testified that the individual could perform work as an administrative support worker (such as an addresser), an order clerk, and a charge account clerk. A.R. at 528-29. According to Plaintiff, these conclusions were in error because the DOT indicates that the jobs identified by the VE each require a reasoning development level of 2 or 3 but Plaintiff was limited to performing only

simple instructions, which Plaintiff argues corresponds under the DOT's General Educational

Development to a reasoning level of 1.[6]  Pl.'s Mot. at 23-26.

Plaintiff's argument, however, is based upon a faulty premise — namely, that the ALJ

determined that Plaintiff was limited to performing only simple instructions.  The ALJ did not

make any such finding nor does the substantial evidence in the record support Plaintiff's present

assertion that he was limited to only performing work that involved simple instructions.  In

assessing Plaintiff's mental RFC, the ALJ determined that Plaintiff was "able to think,

communicate, and act in his own interest; "can follow basic instructions;" and "demonstrated a

good ability at the hearing to understand, remember and respond to the questions posed by both

the undersigned [ALJ] and his legal representative."  A.R. at 18.  The ALJ appropriately took

these limitations into consideration in his hypothetical questions to the VE, asking the VE to

consider an individual who had the capacity for "low-stress, routine type of work . . . that doesn't

require more than moderate attention, concentration, [] persistence and pace for long periods of

---

[6] Each of the job descriptions in the DOT contains a "definition trailer" that sets forth a number of selected occupational characteristics and requirements of the occupation, including the General Educational Development or "GED."  *See* DOT, Appendix C–Components of the Definition Trailer, Section III (describing the GED).  As is relevant here, one subcomponent of the GED is the "Reasoning Development."  A reasoning development *level 1* requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  A reasoning development *level 2* requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations."  A reasoning development *level 3* requires the individual be able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations."  *See* DOT, App. C, § III, Reasoning Development.  In this case, the occupations identified by the VE require either a reasoning development level of 2 (e.g., office helper and addresser) or a reasoning development level of 3 (e.g., cashier, sales attendant, charge account clerk, and order clerk).  *See* Pl.'s Mot., Exs. A-H.

time" and who had "borderline intellectual functioning." *Id.* at 527-29.  Contrary to Plaintiff's assertion, then, the ALJ did not find that Plaintiff was limited to simple instructions only.

Plaintiff has not directed the Court to any evidence in the record indicating otherwise. Indeed, Plaintiff has failed to cite to or otherwise indicate which portion(s) of the Administrative Record he believes supports his present assertion that he was limited to performing simple instructions.  Nonetheless, from the Court's own review, it appears likely that Plaintiff may be relying on the medical reports completed by Dr. Schiff and Dr. Cott — in particular, their statements that Plaintiff was capable of performing simple tasks and routines.  A.R. at 217-19, 236-49.  Significantly, however, although Dr. Schiff and Dr. Cott observed that Plaintiff was capable of performing simple tasks, neither concluded that Plaintiff was ***limited*** to performing only work involving simple tasks or routines.  To the contrary, Dr. Schiff determined that Plaintiff had "moderately good, if somewhat erratic, success with more complex or detailed tasks and instructions." *Id.* at 218.  Similarly, Dr. Cott reported that Plaintiff had no marked limitations in any of his mental residual functional capacities and had only moderate limitations in his ability to understand, remember, and carry out detailed instructions. *Id.* at 232-33.  As noted above, the ALJ took these findings into consideration in assessing Plaintiff's RFC and in framing the hypothetical questions to the VE.

In addition, Plaintiff argues that the ALJ wrongly relied on the VE's testimony because certain of the jobs identified by the VE — specifically, the positions of cashier, charge account clerk, and order clerk — require a temperament to attain precise set limits, tolerances, and standards, which Plaintiff argues is inconsistent with the ALJ's finding that Plaintiff was limited to work that was of a low stress routine nature.  Pl.'s Mot. at 25-26.  Plaintiff, however, offers no

case law, evidence, or other legal authority to support his assertion that occupations requiring a temperament to attain precise set limits, tolerances, and standards are inconsistent with the ALJ's finding that Plaintiff could perform a low stress work routine. Similarly, Plaintiff also argues that the ALJ erred in relying on the VE's testimony because certain of the jobs identified — namely, the positions of sales attendant, charge account clerk, and order clerk — require the temperament to deal with people, which Plaintiff argues is inconsistent with the ALJ's finding that Plaintiff was moderately limited in his ability to work in proximity to others. *Id.* at 26. Again, however, Plaintiff offers no support for this statement. Moreover, the ALJ did not find that Plaintiff was precluded from working near or around others, but only that Plaintiff's ability to do so was moderately limited; such a finding is not clearly inconsistent with the VE's testimony that Plaintiff could do work that required him to deal with other people. Finally, the Court notes that even if it were to accept Plaintiff's assertions that he could not perform work that required a temperament to attain precise set limits, tolerances, and standards and to deal with people, Plaintiff has not shown that he cannot perform the remaining work identified by the VE — namely, an office helper (67,000 nationally and 1,000 locally) and an addresser (42,000 nationally and 400 locally). The VE's testimony as these jobs alone is sufficient to satisfy the Commissioner's burden of showing that a disability claimant is capable of performing jobs reasonably available in the national economy. *See, e.g., Trimiar v. Sullivan,* 966 F.2d 1326, 1330-32 (10th Cir. 1992) (testimony that 650-900 jobs exist in state sufficient to satisfy Commissioner's burden at step five); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474, 1478 (9th Cir. 1989) (finding that "1,266 jobs are within the parameters of 'significant numbers'"); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (finding that 500 jobs

represents a significant number).  Therefore, the Court rejects Plaintiff's argument that the ALJ erred in relying on the VE's testimony at step five of the sequential process.

## IV.  CONCLUSION

Based on the foregoing review of the relevant law and the administrative record, the Court finds that the Administrative Law Judge applied the correct legal standards when he denied Plaintiff's claim for Supplemental Security Income Benefits and Disability Insurance Benefits, and that his conclusions are supported by substantial evidence.  The Court shall therefore DENY Plaintiff's [8] Motion for Judgment of Reversal and GRANT Defendant's [11] Motion for Judgment of Affirmance.  This case shall be dismissed in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date:   June 30, 2010

_/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge